PHILIP DORSEY, JR. ET AL. *v.* FRANCIS PETROTT, SECRETARY OF STATE ET AL.

[No. 6, April Term, 1940.]

*Decided May 22nd, 1940.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Benjamin Michaelson,* with whom was *Hugh M. Frampton* on the brief, for the appellant.

*William C. Walsh, Attorney General,* and *William L. Henderson, Deputy Attorney General,* with whom was *H. Vernon Eney, Assistant Attorney General,* on the brief, for the Secretary of State, appellee.

*R. Samuel Jett,* submitting on brief, for J. William Middendorf, Jr., intervenor, appellee.

PARKE, J., delivered the opinion of the Court.

The appeal in this case is from an order of the Circuit Court for Anne Arundel County dismissing the petition of the appellants for a writ of mandamus to compel the Secretary of State to refuse to proceed with the reference of chapter 353 of the Acts of the General Assembly of Maryland, 1939, to a vote of the electorate under the provisions of the Referendum Amendment, article XVI of the Constitution. All the procedural formalities for the submission of the Act have been complied with, and

the sole question on the demurrer to the petition, and on this appeal, is whether chapter 353 is a referable act under the Amendment. The problem is one of constitutional law, and its answer depends upon whether the Act is a law making an "appropriation for maintaining the State Government."

Chapter 673 of the Acts of 1914 of the General Assembly of Maryland, which was ratified by the vote of the State at the election held on November 2nd, 1915, added article XVI, title, "Referendum," to the Constitution of the State. By this amendment the people reserved to themselves power by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act, of the General Assembly of Maryland, if approved by the Governor or, if passed by the General Assembly over the veto of the Governor. The power thus reserved is known as the Referendum, and its scope, mechanism, operation and effect are prescribed and defined in the six sections of article XVI. The general application of the Referendum is subject to two express limitations which are found in sections 2 and 6. The latter exception is that "No law or constitutional amendment, licensing, regulating or prohibiting, or submitting to local option the manufacture or sale of malt or spirituous liquors shall be referred or repealed under any Act [sic] of the provisions of this Article." *Beall v. State,* 131 Md. 669, 673, 103 A. 99; *Strange v. Levy,* 134 Md. 645, 648, 107 A. 549; *Poisel v. Cash,* 130 Md. 373, 374, 100 A. 364. The exception quoted has no relation to the problem at bar. The limitation in section 2 is the one with reference to which the pending controversy is concerned. The portion of that section which is to be construed is found in the two sentences at its conclusion: "No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section. The increase in any such appropriation for maintaining or

aiding any public institution shall only take effect as in the case of other laws, and such increase or any part thereof specified in the petition, may be referred to a vote of the people under petition." *Dinneen v. Rider,* 152 Md. 343, 354, 136, A. 754; *Berlin v. Shockley,* 174 Md. 442, 199 A. 500.

Since the statute for which a referendum is sought provides for no appropriation for maintaining or aiding any public institution within the contemplation of the Referendum of the Constitution, the problem of construction is thus restricted to the words "No law making any appropriation for maintaining the State Government * * * shall be subject to rejection or repeal under the Section."

The subject matter of the Act is the conservation of the fisheries of tidewater Maryland, which is undoubtedly a function of government. These fisheries constitute one of the most important and valuable natural resources of the State, and their protection, preservation, development and maintenance are an imperative duty of Government. So, if the Act under consideration is a law making an appropriation for the maintenance of the tidewater fisheries, the Act would not be referable to the electorate. The inquiry is narrowed, therefore, to whether the Act is a "law making an appropriation" within the meaning of the Referendum Amendment, when construed in connection with other related provisions of the Constitution.

To know what the terms "appropriation" here means it is necessary to look to the Constitution of the State. By section 32 of article III of the Constitution no money may be drawn from the Treasury of the State without an appropriation by law which shall distinctly specify the sum appropriated and the object to which it shall be applied, except that a contingent fund may be placed at the disposal of the executive, who shall report to the General Assembly at each session the amount expended and the purposes to which it is applied.

Since an early stage in its legislative and constitutional history, a law making an appropriation has had a definite significance. In the first Constitution of Maryland, which was adopted in 1776, the House of Delegates alone had the power to originate money bills. Constitution of 1776, art. X. For the declared purpose of preventing altercation about what is a money bill, the Constitution promulgated its nature in the words "no bill, imposing duties or customs for the mere regulation of commerce, or inflicting fines for the reformation of morals, or to enforce the execution of the laws, by which an incidental revenue may arise, shall be accounted a money bill; but every bill, assessing, levying, or applying taxes or supplies, for the support of government, or the current expenses of the State, or appropriating money in the treasury, shall be deemed a money bill." Constitution of 1776, art. XI; *Niles on Maryland Constitutional Law*, pp. 361, 362. So, it may be said that this definition of money bills embraces bills providing for the raising of public revenue and for the making of grants or appropriations of the public money in the treasury. 2 *Bouvier's Law Dictionary* (Rawle's Third Revision) 2239, "Money Bills." In the signification given the word, an appropriation, in the constitutional sense, would apparently relate to the withdrawal of public funds in the treasury by bill or legislative grant. It will be seen, however, that this is too restricted a definition, and that an appropriation may be by legislative act or constitutional declaration.

The public funds in the treasury were later further protected by an amendment to the Constitution which was proposed by chapter 339 of the Acts of 1843 and which became a part of the Constitution after its confirmation, on February 14th, 1845, by chapter 86 of the Acts of 1844. Const. of 1776, art. LIX; *Niles on Maryland Constitutional Law*, pp. 393, 371. The amendment so made was that "No money shall be drawn from the Treasury of the State but in consequence of an appropriation made by law."

The second Constitution of the State was adopted in 1851. By its provisions money bills no longer were required to originate in the House of Delegates but could be initiated indifferently in either the House of Delegates or in the Senate, Constitution of 1851, art. III, sec. 18; *Niles on Constitutional Law*, p. 408, but the restriction imposed with reference to the disbursement of state money was enlarged by the mandate: "No money shall be drawn from the treasury of the State, except in accordance with an appropriation made by law, and every such law shall distinctly specify the sum appropriated, and the object to which it shall be applied: Provided, that nothing herein contained shall prevent the legislature from placing a contingent fund at the disposal of the executive, who shall report to the legislature of each session the amount expended and the purposes to which it was applied. An accurate statement of the receipts and expenditures of the public money shall be attached to and published with the laws after each regular session of the general assembly." Constitution of 1851, art. III, secs. 20, 22; art. VI, sec. 2; *Niles on Constitutional Law*, pp. 408, 409, 422. The constitutional section quoted remained unchanged, and was incorporated in its entirety in the third Constitution of 1864, art. 3, sec. 31. Constitution of 1864, art. III, secs. 31, 33; art. VI, sec. 3; *Niles on Constitutional Law*, pp. 446, 447, 462. Except for the addition of an inhibition of a withdrawal "by any order or resolution," the section was adopted and continued in the fourth and present Constitution of 1867, art. 3, sec. 32. Constitution of 1867, art. III, secs. 32, 34; art. VI, sec. 2; *Niles on Constitutional Law*, pp. 490, 491. The change noted was apparently made without discussion, *Perlman's Const. Convention of 1867*, p. 273, and its effect is to exclude a legislative order or resolution from the category of an appropriation within the meaning of the provision. Since the Constitution of 1867, the phrasing of the section is identical with that of the Constitutions of 1864 and 1851, except that the addition mentioned modifies the intro-

ductory clause before the proviso so that it now reads: "No money shall be drawn from the Treasury of the State by any order or resolution, nor except in accordance with an appropriation by law; and every such law shall distinctly specify the sum appropriated and the object to which it shall be applied."

The provisions of the Constitution were held in *McPherson v. Leonard,* 1868, 29 Md. 377, to have been sufficiently complied with by a statute which directed the Comptroller to pass upon and audit certain claims for uniforms supplied to members of the militia of the state pursuant to the authorization of statute, at a cost of not more than $20 a uniform, and to draw his warrant upon the Treasurer in favor of each claimant for the amount so found rightly to be due, and the Treasurer was commanded to pay these warrants out of any money thereafter in the treasury, not otherwise appropriated, provided the aggregate amount of said warrants should not exceed $300,000. There was a dissent from this decision on the ground that the appropriation of public funds thus made did not specify the sum appropriated and the object to which it shall be applied, on the theory that the appropriation was conditional, since it was to have no effect if the sums found by the Comptroller would exceed the limitation prescribed. The prevailing opinion adopted a different view. The decision was fundamentally that a compliance with the constitutional mandate does not exact specification to a particular degree, but is effected if the constitutional conditions imposed are ascertained by the terms of the appropriation. The court applied the maxim *Id certum est quod certum reddi potest.* The object to which the sum was to be applied was distinctly specified, and its aggregate would be ascertained by the audit of the Comptroller as provided by the statute. Furthermore the act under consideration directed that the warrant of the Comptroller should be paid out of any money thereafter in the treasury not otherwise appropriated, and, as observed by the court: "This is certainly an appropriation, and a fund is

dedicated to its payment." The certainty of the sum is supplied by the provision that the aggregate of the Comptroller's warrant shall not exceed $300,000, which is a specific fixation of the amount appropriated. The sum thus delimited is not deprived of its specific nature by the fact that the amount may not be wholly disbursed.

An earlier case defined an appropriation in another permitted form. In *Thomas v. Owens,* 1853, 4 Md. 189, the salary of the Comptroller for the period of twelve months had been provided for by the Legislature in the general appropriation act, but had not been so provided for an immediately prior period of twenty-one days during which the salary likewise accrued due. At the time the Constitution declared that "No money shall be drawn from the treasury of the State, except in accordance with an appropriation made by law." Since no act of the General Assembly had been passed which covered the antecedem period named, it was argued that no appropriation by law had been made, and hence the Treasurer was forbidden to honor the warrant of the Comptroller covering this period. The appellate court held this is too narrow a construction; and that, from the tenor of the whole instrument, it is clear that the mandate of the organic law that the Comptroller "shall receive an annual salary of two thousand, five hundred dollars," which "shall not be diminished," was an appropriation by constitutional mandate of a more solemn intendment than if made by an act of the General Assembly. 4 Md. at pages 224-228. *Groome v. Gwinn,* 43 Md. 572, 597.

Similarly within this class of an appropriation by a constitutional provision is the dedication of the School Fund to educational use by section 3 of article VIII of the Constitution of 1867. The mandate there is that "The School Fund of the State shall be kept inviolate, and appropriated only to the purposes of education." See *Weddle v. School Commissioners,* 94 Md. 334, 51 A. 289.

Again, the Constitution prescribes that no debt is to be contracted by the Legislature, unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on the debt as it falls due and also to discharge the principal thereof within fifteen years from the time of the contracting of the debt. The money so to be collected is not to be used for any other purpose until the interest and debt are fully paid. Const. of 1851, art. III, sec. 22; Const. of 1864, art. III, sec. 33; Const. of 1867, art. III, sec. 34. It is evident that the Referendum Amendment did not mean to include within the purview of its operation a statute to raise revenues for these specific purposes by a levy of taxes or by the imposition of other fiscal measures. The act for these purposes and the moneys so procured are, therefore, an act and a fund for the maintenance of the State Government; and, so, the act is excepted from the Referendum Amendment. There is no basis to assume that a law passed pursuant to a constitutional requisite and in fulfilment of an authorized undertaking whereby funds had been procured for public use is subject to repeal as a law within the meaning of that term as used in the Referendum Amendment.

Nor is there any sound basis for the construction that a law imposing or providing for a tax levy or other means of raising revenue for the maintenance of the state government is a law referable to the electorate pursuant to the terms of the Referendum Amendment. If such a law should fail to comply with the conditions created by section 32 of article III of the Constitution, it would be ineffective as an appropriation because of this failure, but it would not thereby become a law within the Referendum Amendment. The approval or rejection by popular vote under the Referendum Amendment would neither validate nor invalidate an act which was inherently unenforceable for failure to fulfil the conditions prescribed for the withdrawal of public money from the Treasury.

The determinative characteristics of an appropriation for maintaining the State Government at the time of the adoption of the Referendum Amendment in 1915 were not fundamentally affected by the Budget Amendment of 1916 (see Laws 1916, ch. 159), which introduced, nevertheless, an altered fiscal procedure. The Budget Amendment was not designed to interfere with the operation of the Referendum Amendment. Its purpose was to require that all appropriations by the General Assembly of money out of the treasury should be by either a budget bill or a supplementary appropriation bill. *Baltimore v. O'Conor,* 147 Md. 639, 648-651, 128 A. 759. If there be any inconsistency, the Budget Amendment is declared to prevail. Const. art. III, sec. 52, and section D (Fourth) (Code, vol. 1, p. 108).

The budget bill is prepared by the Governor and submitted to the General Assembly. Each budget is divided into two parts. The first part is designated "governmental appropriations," and shall embrace an itemized estimate of appropriations: (1) For the General Assembly as certified to the Governor in the manner provided; (2) for the Executive Department; (3) for the Judiciary Department as provided by law, certified to the Governor by the Comptroller; (4) to pay and discharge the principal and interest of the debt of the State of Maryland in conformity with section 34 of article III of the Constitution, and all laws enacted in pursuance thereof; (5) for the salaries payable by the State under the Constitution and laws of the State; (6) for the establishment and maintenance throughout the state of a thorough and efficient system of public schools in conformity with article VIII of the Constitution and laws of the State; (7) for such other purposes as are set forth in the Constitution of the State. The second part of the Budget is denominated "general appropriations," and shall include all other estimates of appropriations.

The General Assembly shall not amend the budget bill so as to affect either the obligations of the State under section 34 of article III of the Constitution, or the pro-

vision made by the laws of the State for the establishment and maintenance of a system of public schools or the payment of any salaries required to be paid by the State of Maryland by the Constitution thereof; and the General Assembly may amend the bill by increasing or diminishing the items therein relating to the General Assembly, and by increasing the items therein relating to the judiciary, but, except as there specified, may not alter the Budget Bill except to strike out or reduce items therein, provided, however, the salary or compensation of any public officer shall not be decreased during his term of office. When the budget bill is passed by both houses of the General Assembly it shall be a law immediately without further action by the Governor.

After the budget bill is finally acted upon by both houses, other appropriations may be considered, and supplementary appropriation bills may be passed, but these are not valid unless (1) every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated; (2) such bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in said bill, whose prescribed passage is subject to the provisions that it be presented to the Governor of the State as required by section 17 of article II, and thereafter all the provisions of this section as to approval, veto and reconsideration, and passage over his veto as thereby required shall apply. Code (1924) vol. 1, pp. 105-108.

It is apparent from this summary of its relevant provisions that the Budget Amendment is designed to provide the general appropriation bill which, with the authorized supplementary appropriation bills, embraces, by constitutional declaration, all appropriations for governmental purposes. Thus, by force of the Budget Amendment, all authorizations for the disbursements of state funds must be by the budget bill or by such a supplementary appropriation bill as is provided by the Budget Amendment. *Baltimore v. O'Conor*, 147 Md. 639,

648-651, 128 A. 759; *Red Star Line v. Baughman,* 153 Md. 607, 611, 139 A. 291. While such a supplementary appropriation bill must provide the revenue necessary to pay the amount of the appropriation for the single work, object, or purpose therein stated by a tax, direct or indirect, to be laid and collected as specified by the bill, the budget bill itself does not provide the means for the raising of the revenue requisite for the payment of the appropriations made. Hence it is clear, not only from public necessity, but also from the Budget Amendment, that the budget bill is to be implemented by the passage of such money bills or revenue measures as shall produce and supply the moneys necessary for the Treasury to meet the appropriations made by the budget bill. The enactment of such legislation gains the quality of definiteness, in the sum appropriated and the object to which it is applied, by the budget bill, of which the legislation supplying the money is an associated and necessarily component part of one fiscal system. *Billingsley v. State,* 14 Md. 369, 376; *Applestein v. Baltimore,* 156 Md. 40, 54, 55, 143 A. 666; *Winebrenner v. Salmon,* 155 Md. 563, 567, 142 A. 723; *Hagerstown v. Littleton,* 143 Md. 591, 599, 123 A. 140; *Sutherland on Statutory Construction,* secs. 283, 284.

The essential unity of the revenue measure to provide the funds appropriated by the budget bill gains certainty from its public necessity. The text of the Amendment argues to the same effect. On the one hand the Budget Amendment makes it mandatory upon the executive to submit a budget which shall contain a complete plan of proposed expenditures and estimated revenues for the particular fiscal year to which it relates. Among other duties, he shall make any suggestion he conceives expedient as to methods for the reduction or increase of the State's revenue. On the other hand, the Amendment empowers the Legislature to enact such laws as shall not be inconsistent with the Budget Amendment as may be necessary and proper to carry out its provisions. These two, as well as other provisions for which man-

datory legislation is prescribed, as, for example, in the case of the payment of the principal and interest of the public debt, and the exaction of a particular tax to meet the appropriation made by a supplementary appropriation bill, irrefutably indicate that the Budget Amendment contemplates as an integral part the passage of revenue measures to raise the funds the appropriations require. It follows that revenue measures to raise the public funds to pay the appropriations of the Budget Bill are excepted from the operation of the Referendum Amendment, although the revenue thus procured is disbursed by the Treasury through the provisions of the budget without any express authorization in the money bill for its disbursement.

Since the adoption of the Budget Amendment, this court has had but two cases which involved whether or not the appropriations made by supplementary appropriation acts were within the exception in the Referendum Article of the Constitution. The first case is that of *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723, in which the proceeds of an increased tax on gasoline were dedicated by the statute to the creation of a special fund to be applied, in specified proportions, to the construction of lateral public roads in the counties and to the making and maintenance of the streets and highways of Baltimore City. The second case is reported in *Bickel v. Nice,* 173 Md. 1, 192 A. 777, and there the act provided for the issue of the State's obligations, whose proceeds were to be applied to the erection and equipment of a new building in Annapolis, the capital of the State, for the purpose of supplying offices and accommodations for public officials of the State. In both instances, the court held that the appropriations were for a primary governmental function and designed for the maintenance of the government, and, therefore, the acts were within the exceptions and not referable. The decisions mentioned are not in reference to the present questions, and do not militate against the views here expressed.

As a result of this review of the constitutional provisions and the decisions noted, it is concluded that an appropriation of public funds is made by a constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum of money for a specified public object or purpose to which such sum is to be applied. *Supra.* It follows that, although an act of the General Assembly may be passed for the purpose of maintaining the State government, the act is nevertheless subject to the Referendum, unless it be an act so appropriating public funds for that purpose.

The bill for which a Referendum is asked is plainly in relation to a governmental function. Its subject matter is a change in the administrative law of the State with respect to the conservation of her natural resources.

The question remains, Was the act a law making an appropriation for the governmental function mentioned? The Act was to take effect on June 1st, 1939, as was a companion Act known as chapter 354 of the Acts of 1939. The purpose of these two Acts was to abolish the heretofore existing Conservation Commission, and to substitute two separate commissions. One of these Acts (chapter 354) created the State Game and Inland Fish Commission, and gave it control of certain natural resources of the state, as wildfowl, birds, game, inland fish and fur-bearing animals, which had formerly been committed to the Conservation Commission. The other Act (chapter 353) for which a referendum is sought, and with which this appeal is concerned, created a Commission of Fisheries, and transferred and committed to it all the rights, powers, duties and functions of the Conservation Commission with respect to the sea food resources of Tidewater Maryland, and conferred upon the new Commission various duties and powers with reference to the supervision, regulation, protection, maintenance and control of these resources. The practical result of these Acts was to divide the conservation of the state's natural resources between two commissions, and

to confer upon one the administration of the laws with reference to the conservation of the tide water fisheries; and, upon the other, the administration of the laws with reference to the conservation of game and inland fish. In order to accomplish this change of policy in the administration of the conservation laws, it was necessary for the repeal of a number of the existing sections of the Code relating to the conservation of natural resources, and other sections were repealed and re-enacted with amendments, but these changes were incidental to the legislative purpose and it is not necessary to the discussion on this appeal for the provisions of the new statute to be further set forth except as details may later become requisite.

Chapter 353 is a general law. It creates a new subtitle, the "Commission of Fisheries," to article 19A of the Annotated Code of Maryland (1935 Supplement), title Conservation of Natural Resources, and enacts sixteen new sections, under the sub-title. These sixteen sections create the Commission of Fisheries of the State of Maryland, and prescribe the number of members who shall compose it, and their qualifications and residences and the mode of their appointment, with such salaries as may be fixed by the budget within a specified maximum. The sections grant and define the rights, powers, duties and functions of the commission in reference to the natural resources of the state within the bounds of her tidewaters, and the enforcement of the laws and protective measures in relation to matters within their duties, supervision and control. The permanent office of the commission is placed in Annapolis, where all records, papers and documents shall be kept, and the regular meetings held. The commission is required every year to submit to the executive a printed report and account of its operations, receipts, and disbursements.

The commissioner, with the approval of the commission, shall appoint a secretary, a surveyor, a captain, a director of the marine laboratory and biological research, and such other employees, clerks and stenographers as

may be deemed necessary. The duties of the secretary and surveyor, the captain, and director in certain particulars are set forth. In addition, a similar power of appointment is granted for county inspectors and deputy inspectors, whose office under the statute is prescribed. The salaries of the appointees to the offices here named are to be within a maximum, but as shall be fixed in the budget.

After the enactment of these sixteen new sections, chapter 353 repeals and re-enacts sections 9 and 11 of article 72 of the Code (1935 Supplement) title "Oysters," sub-title "Culling," and section 129 of the same article, title "Oysters," sub-title "Oyster Culture," which re-enacted sections relate to the provision and enforcement of protective legislation, and provide for the prosecution and punishment of its violators. And, finally, chapter 353 added two new sections to article 72 of the Annotated Code of Maryland (1935 Supplement), title "Oysters," sub-title "General Measurers and Inspectors," to be known as sections 81 and 84. These new sections relate to the inspection of oysters by the county inspector or deputy inspector, and the reports to be made of the quantity of oysters bought by every packer or commission merchant buying oysters in Maryland. An inspection fee is imposed for the oysters caught within the limits of the State of Maryland, but the fee is to be paid to the Comptroller of the State Treasury.

From this summary of chapter 353 it is manifest that it is a general law, and not an appropriation measure. Furthermore, any such contention is negatived by the provisions in the Act that the salaries of the members of the commission and of the subordinate officials, who are to fill the prescribed duties of named offices, are not fixed, except as to the maximum amount, but are remitted to the budget bill for designation and allowance. Again, in the budget bill, which was passed at the same session of the Legislature, an appropriation is expressly made for the benefit of the Commission of Fisheries. At the passage of the budget bill, chapters 353 and 354 were not

enacted but in contemplation, so, after making a detailed appropriation for the Conservation Department for the years 1940 and 1941, it was enacted, and funds thereby appropriated, for the benefit of the Commission of Fisheries and the Maryland State Game and Inland Fish Commission (chapter 354), as follows: "In the event of Senate Bill No. 264 or House Bill No. 480 becoming law, the foregoing appropriation to the Conservation Department is to become available to the department created to supersede the Conservation Department for salaries and expenses of the General Department and to include the further development of the Biological Laboratory at Solomons; and the Board of Public Works is hereby authorized to revise the title and the said appropriation to conform to the requirements of the new law." Acts of 1939, ch. 284, pp. 543-545.

All the features of an appropriation are thus negatived, and it cannot be maintained that chapter 353 regulates the manner in which public funds are to be annually supplied and applied to the conservation of the tidewater fisheries of the state. On the contrary, the statute is of the kind clearly indicated by the Referendum Amendment as being within its purview. In section 2 it is provided that no law enacted by the General Assembly shall take effect before the 1st day of June next after the session at which it is passed, unless it contain a section declaring such law an emergency law and necessary for the preservation of the public health or safety and passed in a prescribed manner. A petition duly filed for a referendum of any law or part of a law susceptible of a referendum and not an emergency law shall not become a law nor take effect on June 1st, but not until thirty days after its approval by a majority of the electors voting thereon at the next ensuing election held throughout the state for members of the House of Representatives of the United States. An emergency law, however, takes effect immediately on its passage and remains in force notwithstanding the petition for a referendum, but shall stand repealed thirty days after having been rejected by a

majority of the qualified electors thereon, "provided, however, that no measure creating or abolishing any office, or changing the salary, term or duty of any officer, or granting any franchise or special privilege, or creating any vested right or interest, shall be enacted as an emergency law." Section 2 of article XVI (Code, vol. 1, p. 163). The purpose of this quoted clause is to obviate the public and private uncertainty, disorder, and confusion which would result from an emergency measure which might create or abolish an office, or change the salary, term or duty of an officer, or grant a franchise or special privilege, or create a vested right or interest, merely from the time of its passage, since an emergency act is effective from that date, until, by virtue of a referendum, it would "stand repealed thirty days after having been rejected by a majority of the qualified electors voting thereon." In thus excluding certain types of legislation from the general class of emergency legislation, the Referendum, in effect, affirms by necessary implication that an act which is not in the form of an emergency measure, but which creates or establishes any office, or changes the salary, term or duty of any public officer, is referable.

The declaration of the Referendum applied to chapter 353 and makes it referable, since it cannot be gainsaid that the Act is a general law and creates and abolishes offices, and changes the terms, duties and salaries of public officers. The provisions for salaries in chapter 353 are not an appropriation or provision for the disbursement of public moneys. The Act merely fixes the maximum allowable, and provides that the salaries shall be determined by the budget bill within the limits imposed. *Supra;* and *State v. Eastcott,* 1928, 53 S. D. 191, 220 N. W. 613; *State Board of Osteopathic Examiners v. Riley,* 192 Cal. 158, 218, p. 1018.

It is contended that this general statute, for the purpose of effecting a change in the policy of the State with reference to the mode in which the natural resources of the State are to be conserved and through

what agencies the laws are to be administered, is transformed into an appropriation act of public funds for three reasons. First: For any violation of the provisions of section 4 of chapter 353 of the Acts of 1939, subsection 10 denounces it as a misdemeanor and, upon conviction, a fine of not less than $100 nor more than $500 is imposed. All monies which arise from fines collected under this section shall be remitted to the Comptroller for credit to the Conservation Fund. It is this remittance to the Comptroller which, it is argued, converts chapter 353 to an appropriation act. As here used "fine" is a pecuniary punishment imposed by a lawful tribunal upon a person convicted of a violation of the provisions of section 4 of chapter 353. A fine is payable to the State or as the State determines, and its remittance to the Comptroller for credit to the Conservation Fund is no authority for it to be paid from the Treasury for a special use. Should a fine fall into and become a part of any Conservation or other particular fund, it cannot be said to be susceptible of withdrawal except as a part of an appropriation by virtue of the budget bill or one of its supplementary bills. *Supra*.

Second: The next reason is that the statute, among other things, casts upon the inspectors appointed by the Commissioner of Fisheries the duties of inspection of oysters caught in the tidewaters of the state. The inspection fees for such services are payable weekly to the Comptroller or his agent. There is no provision made by chapter 353 in relation to the disbursement of the fees so paid.

Third: While not specifically stated in the brief of the petitioners as being relied upon by them, the provision of the new section 12D, which was added by chapter 353 to article 19A of the Code, is mentioned by the respondent as constituting a third reason urged by the petitioners in support of their position. By section 13 of article 39 of the Code, as enacted by chapter 471 of the Acts of 1929, the Conservation Commission of Maryland was empowered, under stated circumstances,

to enter into an agreement with the owner, lessee, or operator of a dam upon the waters of the state to pay, in the place of the maintenance of fish ways or ladders, a sum of money periodically to the Conservation Commission to be expended by that department for the purpose of supplying with food fish the waters of the pool above and of the stream below the dam. The new section 12D provided that all such sums of money so agreed to be paid should thereafter be paid to the Commission of Fisheries and be annually expended by it in the propagation of tidewater fish. Section 12D is not a part of the budget bill, nor is it a supplementary appropriation bill, nor is it in fulfilment of any constitutional appropriation and, therefore, section 12D is not a law making an appropriation for maintaining the State Government, within the Constitution as affected by the Budget Amendment. *Supra; Baltimore v. O'Conor,* 147 Md. 639, 648-651, 128 A. 759; *Red Star Line v. Baughman,* 153 Md. 607, 611, 139 A. 291.

All three of the reasons are, also, in common unsound on the principle that an act of the General Assembly which relates primarily and specifically to a subject matter of general legislation cannot be converted into an appropriation bill merely because there may be an incidental provision for an appropriation of public funds.

The point is illustrated by what was said in *Bengzon v. Secretary of Justice and Insular Auditor of the Philippine Islands,* 299 U. S. 410, 413, 57 S. Ct. 252, 254, 81 L. Ed. 312, 314: "The term 'appropriation act' obviously would not include an act of general legislation; and a bill proposing such an act is not converted into an appropriation bill simply because it has had engrafted upon it a section making an appropriation. An appropriation bill is one the primary and specific aim of which is to make appropriations of money from the public treasury. To say otherwise would be to confuse an appropriation bill proposing sundry appropriations of money with a bill proposing sundry provisions of general law and carrying an appropriation as an incident." See *Warner*

252

*v. White,* 1931, 39 Ariz. 203, 4 P. 2nd 1000; *State v. Hinkle,* 152 Wash. 221, 277 P. 837; *Winebrenner v. Salmon,* 155 Md. 563, 571, 142 A. 723.

For the reasons here given, the order dismissing the petition will be affirmed.

*Order affirmed with costs to be paid by the appellants.*