JUSTICE TRIEWEILER
dissenting.
I dissent from that part of the majority’s opinion which concludes that the suspension of Chapter 634 did not violate the Federal and State Constitutions.
I conclude that when as few as eight percent of the State’s voters can exercise an effective veto over legislation enacted by representatives who were elected by a majority of the State’s voters; and when, based on that veto, services, benefits and educational opportunities are permanently lost by citizens who were denied any voice in the matter, then the principle of one equally weighted vote for each person is rendered meaningless and the Equal Protection Clause of *421 the Fourteenth Amendment to the United States Constitution, and Article II, Section 4, of the Montana Constitution, have been violated.
I furthermore conclude that when a referendum, by suspending a revenue-raising measure such as 1993 Montana Laws, Chapter 634, leaves the Legislature with no alternatives other than an unbalanced budget in violation of Article VIII, Section 9, of the Montana Constitution, or rescinding an appropriation of money already made, then the referendum is, in effect, one to reject an appropriation of money in violation of Article III, Section 5, of the Montana Constitution.
Finally, I conclude that Referendum 112, by suspending Chapter 634 which was enacted pursuant to the Legislature’s power to tax, would unconstitutionally suspend that power in violation of Article VIII, Section 2, of the Montana Constitution.
Although these constitutional provisions are, of course, our foremost concern, I also conclude that the ramifications of the majority’s decision will be devastating to the ability of future legislatures to provide for the obligations and services of State government. Because of this decision, government in the State of Montana will always be hostage to tyranny by a small minority who are easily misled by those unimaginative but ambitious persons who would exploit the universal disdain for taxation for their own political benefit.[1]

FACTUAL BACKGROUND

I find the following undisputed facts relevant to the conclusions I have reached:
1. House Bill 671 was passed by the Montana Legislature during the 1993 Legislative Session and was signed by the Governor on May 11,1993. The measure revises state income tax and corporate tax laws. It increased income tax revenue, but shifts the income tax burden. It increases minimum corporate taxes and imposes graduated corporate tax rates.
*422 2. House Bill 671 was passed, in part, for the purpose of raising revenues for the general operation of State government and balancing the state’s budget.
3. House Bill 671 became effective after Montana voters rejected Senate Bill 235, which contained a four percent general sales tax, and was given retroactive application to January 1, 1993. ...
4. Defendants Natelson and Montanans for Better Government circulated the Petition Referendum 112 to place House Bill 671 on the ballot for the November 1994 general election.
5. On September 3, 1993, Defendant Cooney certified to the Governor that he received petitions containing sufficient signatures to place House Bill 671 on the ballot for the November 1994 general election.
6. On September 28, 1993, Defendant Cooney certified to the Governor that he received petitions containing sufficient signatures to require suspension of House Bill 671 until the vote on Referendum 112.
Stipulation of Facts entered into between the parties.
Based upon the Secretary of State’s certification that sufficient signatures were gathered to suspend House Bill 671 (which was enacted as 1993 Montana Laws, Chapter 634), the Governor of the State of Montana, on October 8,1993, issued a proclamation calling the 53rd Legislature for a special session. In his proclamation he stated that:
WHEREAS, Article VIII, Section 9, of the Montana Constitution provides that appropriations by the Legislature shall not exceed anticipated revenue; and
WHEREAS, Article VI, Section 9, of the Montana Constitution provides that it is the responsibility of the Governor to recommend measures necessary to balance the budget; and
WHEREAS, a referendum undertaken pursuant to Article III, Section 5, of the Montana Constitution, has resulted in both the suspension of House Bill 671 and in its placement on the ballot for approval or rejection by the qualified electors on November 8,1994; and
WHEREAS, the suspension of House Bill 671 has made its provisions inoperative, thereby making it virtually impossible to balance the state’s budget without legislative action.
*423 NOW, THEREFORE I, Marc Racicot, Governor of the State of Montana, pursuant to the authority vested in me by the Constitution and laws of the State of Montana do hereby call the Fifty-Third Legislature into Special Session in Helena, at the State Capitol, at the hour of 9:00 A.M., the 29th day of November, 1993, and hereby direct the Special Session of the Fifty-Third Legislature to consider action on the following:
1. Legislation to balance the state’s budget and address appropriate personnel and operational issues.
7. Appropriations to state and local government and programs, allocation of revenue, accounting procedures and budget modifications for state and local government agencies ....
In other words, House Bill 671 was enacted to balance the state budget. When it was suspended, the budget was unbalanced and the Legislature was forced to meet and reduce appropriations.
The Legislature met in special session from November 29, 1993 through December 20,1993. During this time, the Legislature cut $19 million that had been appropriated for public education in kindergarten through twelfth grade; $12.5 million which had been appropriated for human services; and $11.8 million which had been appropriated for higher education. (Office of the Legislative Fiscal Analyst, Appropriations Report 1995 Biennium, November 1993 Special Session (February, 1994) at summary page 2.)

EQUAL PROTECTION CLAUSE

The majority dispenses with the constitutional principle established in Reynolds v. Sims (1964), 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506, that each person eligible to vote is entitled to cast an equally weighted vote with its conclusion that “[ujnlike the reapportionment cases, this is not a case concerning access to the legislative process.” However, contrary to that conclusion, access to the legislative process is exactly what this case is about.
This State’s legislative representatives were elected by a majority of Montana’s voters. In their representative capacity, a majority of those legislators enacted laws, including House Bill 671. However, their representative efforts were effectively vetoed by a small minority of voters who supported Referendum 112 without any opportunity by those who opposed Referendum 112 to cast a vote in opposition. The argument that those who oppose Referendum 112 will ultimately *424 have an opportunity to express their view on November 8,1994, is of little constitutional significance, considering the irreversible suspension of the majority’s decision for the intervening 14 months.
To hold that Reynolds has no significance beyond legislative apportionment is to miss the important principle of “one equally weighted vote for each person” that it reaffirmed. While that principle was discussed in terms of representative government, that discussion was based on the historical principle that each person’s vote in this country has historically been given effect through their elected representatives. The court in Reynolds stated:
State legislatures are, historically, the fountainhead of representative government in this country. A number of them have their roots in colonial times, and substantially antedate the creation of our Nation and our Federal Government. In fact, the first formal stirrings of American political independence are to be found, in large part, in the views and actions of several of the colonial legislative bodies. With the birth of our National Government, and the adoption and ratification of the Federal Constitution, state legislatures retained a most important place in our Nation’s governmental structure. But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State’s legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.
Reynolds, 377 U.S. at 564-65, 84 S.Ct. at 1383.
It is clear that what the Court in Reynolds found offensive to the Equal Protection Clause of the Fourteenth Amendment was minority control over legislative bodies. In that regard, the Court stated:
[A]nd to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result.... And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged.
*425 Reynolds, 377 U.S. at 565, 84 S.Ct. at 1383.
It is for these reasons that the Court majority in Reynolds made clear that while its discussion was couched in terms of representation, the principle with which it was really concerned was the right of each voter to participate equally in a representative democracy. For that reason, the Court explained that:
While the result of a court decision in a state legislative apportionment controversy may be to require restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State’s citizens which constitutes an impermissible impairment of their constitutionally protected right to vote. Like Skinner v. Oklahoma, [(1992)], 316 U.S. 535, [62 S.Ct. 110, 86 L.Ed. 1655], such a case “touches a sensitive and important area of human rights,” and “involves one of the basic civil rights of man,” presenting questions of alleged “invidious discriminations ... against groups or types of individuals in violation of the constitutional guarantee of just and equal laws.” 316 U.S. at 536, 541, [62 S.Ct. at 1111, 1113]. Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in Yick Wo v. Hopkins, [(1886)], 118 U.S. 356, [6 S.Ct. 1064, 30 L.Ed 220], the Court referred to “the political franchise of voting” as “a fundamental political right, because preservative of all rights.” 118 U.S. at 370, [6 S.Ct. at 1071].
Reynolds, 377 U.S. at 561-62, 84 S.Ct. at 1381.
For these reasons, the Court in Reynolds held that legislative apportionment which diluted the weight of urban voters violated the Equal Protection Clause of the Fourteenth Amendment.
The State of Montana and the majority of this Court would contend on the one hand that the referendum process provided for in Article III, Section 5(2), of the Montana Constitution, is a continuation of the legislative process, and therefore, the result accomplished as a result of Referendum 112 was not a suspension of the power to tax held exclusively by the Legislature pursuant to Article VIII, Section 2, of the Montana Constitution. However, that argument finds no comfort in the Reynolds decision. The Supreme Court in Reynolds specifically held that a bicameral legislature in which only one house is appor *426 tioned according to population does not satisfy the equal protection requirement. In language relevant to the circumstances in this case, the Supreme Court stated that:
[W]e necessarily hold that the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis. The right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens in the election of members of one house of a bicameral state legislature would amount to little if States could effectively submerge the equal-population principle in the apportionment of seats in the other house. If such a scheme were permissible, an individual citizen’s ability to exercise an effective voice in the only instrument of state government directly representative of the people might be almost as effectively thwarted as if neither house were apportioned on a population basis. Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis, stemming directly from the failure to accord adequate overall legislative representation to all of the State’s citizens on a nondiscriminatory basis. In summary, we can perceive no constitutional difference, with respect to the geographical distribution of state legislative representation, between the two houses of a bicameral state legislature. [Emphasis added].
Reynolds, 377 U.S. at 576, 84 S.Ct. at 1389.
Likewise, in this case the fact that both Montana’s House of Representatives and Senate are apportioned on a population basis is of no benefit to the majority who elected them if a minority can routinely and effectively veto their efforts in a process which provides no opportunity for those who are opposed to the proposed referendum to cast their vote in opposition. In conclusion, I can comprehend no difference between the bicameral scenario prohibited in Reynolds and the referendum process permitted in this case. In each case, the will of the majority is effectively thwarted by a minority of voters.
The majority cites Gordon v. Lance (1971), 403 U.S. 1, 6, 91 S.Ct. 1889, 1892, 29 L.Ed. 2d 273, 276, for the principle that the will of the majority need not always prevail. However, the majority’s citation is incomplete and oversimplifies the holding in Gordon. The challenge in that case was to a West Virginia statute which provided that a political subdivision could not incur bonded indebtedness nor increase tax rates beyond those established by the Constitution without *427 the approval of 60 percent of the voters in a referendum election. While the Court held that requiring a super majority did not violate the Equal Protection Clause of the Fourteenth Amendment, the Court qualified its holding by stating that:
We intimate no view on the constitutionality of a provision requiring unanimity or giving a veto power to a very small group. Nor do we decide whether a State may, consistently with the Constitution, require extraordinary majorities for the election of public officers.
Gordon, 403 U.S. at 8, n.6, 91 S.Ct. at 1893, n.6.
What the Court in Gordon refused to address is exactly the situation that exists in this case. Therefore, Gordon is no authority for the result arrived at by the majority.
Because the principles articulated in Reynolds are so clearly applicable to the situation in this case, I do not believe that further equal protection analysis is necessary, as is suggested in the majority opinion. For these reasons, I dissent from the majority’s conclusion that the process by which Chapter 634 was suspended does not violate the Equal Protection Clauses of our State and Federal Constitutions.

BALANCED BUDGET

The majority opinion deals with Article VIII, Section 9, of the Montana Constitution which requires a balanced budget, and that part of Article III, Section 5, which prohibits referenda rejecting appropriations, in isolation, and thereby, concludes that neither prohibition was violated. However, in doing so, the majority opinion violates a cardinal rule of constitutional construction, which is that u[a]ll of the provisions of the Constitution bearing upon the same subject are to receive appropriate attention and be construed together.” Board of Regents v. Judge (1975), 168 Mont. 433, 444, 543 P.2d 1323, 1330. For that reason, in Board of Regents, 543 P.2d at 1330, we held that our task is to harmonize in a practical manner those provisions of the Constitution which would otherwise be in apparent conflict. The majority opinion fails to do so.
On the one hand, the majority concludes that Referendum 112 did not cause an unbalanced budget because the Legislature exercised its only alternative which was to come into special session and cut appropriations. On the other hand, the majority concludes that Referendum 112 did not affect appropriations since it did not directly prohibit the expenditure of money. By isolating its consideration of these separate provisions, the majority has failed to harmonize in a practical manner the various provisions of the State Constitution.
*428 The practical effect of Referendum 112 is that the Legislature was left with one of two alternatives. It could either leave the budget unbalanced in violation of Article VIII, Section 9, or it was forced to reduce expenditures in violation of the prohibition found in Article III, Section 5(1). Considering the practical effect of Referendum 112 and harmonizing the provisions of Montana’s Constitution requires the conclusion that under the facts in this case, the referendum was a rejection of the appropriation of money, and therefore, unconstitutional pursuant to Article III, Section 5(2). This conclusion finds support in other jurisdictions under similar circumstances and based on similar constitutional provisions.
Other states which have considered similar constitutional restrictions on referenda to protect appropriations passed by the Legislature have held that when appropriation bills, such as House Bill 2 from the 1993 regular legislative session, are dependent on revenue bills, such as House Bill 671, then the bills must be read in pari materia for purposes of determining whether they may be referred, and that where they are interdependent, revenue bills may not be referred for a vote. Winebrenner v. Salmon (Md. 1928), 142 A. 723; Dorsey v. Petrott (Md. 1940), 13 A.2d 630; Kelly v. Marylanders for Sports Sanity, Inc. (Md. 1987), 530 A.2d 245; County Road Assoc. v. Board of State Canvassers (Mich. 1979), 282 N.W.2d 774.
In Dorsey, 13 A.2d at 637, the Maryland Court reasoned:
It follows that revenue measures to raise the public funds to pay the appropriations of the Budget Bill are excepted from the operation of the Referendum Amendment, although the revenue thus procured is disbursed by the Treasury through the provisions of the Budget without any express authorization in the money bill for its disbursement.
Likewise, in this case, House Bill 671 cannot be considered in a vacuum. Its enactment was interrelated with the appropriations enacted in the 1993 regular session of the Legislature, and those appropriations depended upon the revenue that it raised. The effect of Referendum 112’s suspension of House Bill 671 was to also reject those appropriations which were dependent on the revenue that it generated.
For these reasons, I conclude that Referendum 112 did, in fact, reject an act of the Legislature for appropriation of money, and therefore, was unconstitutional in violation of Article III, Section 5(1), of the Montana Constitution.

*429
SUSPENSION OF POWER TO TAX

Article VIII, Section 2, of the Montana Constitution specifically provides that “the power to tax shall never be ... suspended.” Chapter 634 was enacted by the Legislature pursuant to its power to tax. However, Chapter 634 was suspended pursuant to Referendum 112. The majority concludes that the Legislature’s power was unaffected, even though the tax that it enacted pursuant to that power has been suspended. The logic of this conclusion escapes me. What is the practical purpose of the power to tax if actual taxes levied pursuant to that power can be freely suspended pursuant to the whim of a small minority of voters?
To me, the language of Article VIII, Section 2, is clear. It prohibits exactly what was accomplished by Referendum 112 in this case.
While Article III, Section 5(2), does provide for the suspension of an act of the Legislature by 15 percent of the qualified voters in a majority of the representative districts, that provision of the Constitution (even if the exception for appropriation measures is not considered), is a general provision. The prohibition against suspension of the Legislature’s taxing power found at Article VIII, Section 2, is a specific prohibition. Whether talking about legislation or constitutional provisions, the specific control over the general. Grossman v. State Dept. of Natural Resources (1984), 209 Mont. 427, 682 P.2d 1319.
Therefore, I conclude that Referendum 112 violated Article III, Section 2 of the Montana Constitution and dissent from the maj ority’s conclusion to the contrary.

STATUTE OF LIMITATIONS

Although I dissent from the majority’s conclusion that Referendum 112 was constitutional, I concur with the majority’s conclusion that plaintiff’s complaint was not barred by the statute of limitations found at § 3-5-302(6)(a), MCA.
The principle of equitable tolling is based on principles of fairness and common sense which apply equally in this situation as where two successive actions are brought by the same party. The dissenting opinion of Justices Nelson and Gray, to the effect that it cannot be applied because the original action was, in fact, brought by Natelson and the second action was brought by Nicholson, even though the issues involved were the same, and even though common sense required resolving the first action before filing the second action, exalts form over substance. The approach taken by the dissenters is *430 unduly mechanical and without regard for the equitable principles which are being invoked. In short, I find that the dissenting opinion on this subject is the antithesis of equity.
For these reasons, I concur with the majority’s conclusion that the statute of limitations was equitably tolled.
JUSTICE HUNT joins in the foregoing dissent.

 For example, to gather support for Referendum 112, Natelson claimed that the tax burden of Montanans was the eighth highest in the country, when, in reality, it is near the bottom - at 44th. According to figures from the U.S. Bureau of the Census, the only neighboring state where residents pay a lower percent of income in taxes is South Dakota, which is 45th among the states. However, Natelson failed to acknowledge the correct figures until after the necessary signatures were gathered in support of Referendum 112. (Mike Dennison, Montana Tax Burden Much Lower Than Natelson Claims, Great Falls Tribune (Montana), October 21, 1993, at 1A; Shirley Salemy, Natelson Admits Knowing Tax Claim Was Shaky, Great Falls Tribune (Montana), October 22, 1993, at 1A.)