W. WESLEY BEALL, Sheriff of Prince George's
County, Maryland,

*vs.*

STATE OF MARYLAND, ex rel. LEWIS C. JENKINS.

*Constitution : construction. Statutes : presumptions; Chapter* 13
*of Acts of* 1917, *prohibiting liquor in Prince George's
County; emergency measure. Referendum : Art.
XVI of Constitution; ch.* 673 *of Acts of* 1914.

Chapter 13 of the Acts of 1917, prohibiting the sale of liquor
in certain districts of Prince George's County adjacent to the
District of Columbia, is valid under section 31 of Art. III of
the Constitution, regulating the time after their passage when
statutes shall take effect.                    pp. 675, 679

This section of the Constitution is not repealed or superseded
by Art. XVI of the Constitution, the amendment, Chapter 673
of the Acts of 1914, providing for a Referendum.          p. 674

In construing the Constitution, the construction should be
on the whole instrument, and effect given to every part of it, if
that be possible; and unless there be some reason to the con-
trary, no part of the fundamental law should be disregarded or
regarded as inoperative.                            p. 676

In investigating the constitutionality of a law, the presump-
tion is that it is valid.                            p. 679

It is a principle in the construction of a constitution that con-
struction should be given to every part of it if possible, and that,
unless there is some reason to the contrary, no part of the funda-
mental law should be disregarded or rejected as inoperative.
                                                    p. 676

*Decided December 22nd, 1917.*

This hearing was on original papers transmitted from St. Mary's County by CAMALIER, J., under the provision of section 17 of Article 42 of the Code.

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, PATTISON, URNER and STOCKBRIDGE, JJ.

*Ogle Marbury, Asst. Atty.-Genl.,* and *S. Marvin Peach, State's Atty. for Prince George's Co.,* (with whom was *Atty.-Genl. Albert C. Ritchie* on the brief), for the Sheriff of Prince George's County.

*L. Allison Wilmer* and *George Weems Williams* (with whom was *Robert W. Wells* on the brief), for the relator.

By permission of the Court *James C. Rogers, J. Bibb Mills, George W. Crabbe* and *Wayne B. Wheeler,* filed a brief for certain citizens of Prince George's County.

BURKE, J., delivered the opinion of the Court.

Lewis C. Jenkins was brought before a Justice of the Peace for Prince George's County on or about the 29th day of November, 1917, charged on the oath of R. Fulton Gates with keeping and selling and having in his possession, in his place of business located in Prince George's County, intoxicating liquors contrary to and in violation of the provisions of Chapter 13 of the Acts of the Extraordinary Session of the General Assembly of Maryland, which convened at the City of Annapolis on the 12th day of June, 1917. He declined to give bail, and was committed by said Justice to the Sheriff of Prince George's County for the action of the Circuit Court for that county at its next .ensuing term. An application for a writ of *habeas corpus* was made to the HON. B. HARRIS CAMALIER, an Associate Judge of the Seventh Judicial Circuit, and the writ was issued. In obedience

to the mandate of the writ the Sheriff of Prince George's County produced the body of Lewis C. Jenkins before JUDGE CAMALIER at the Court House in Leonardtown, Maryland, on December 3, 1917, at 3 o'clock P. M., together with the commitment under which he was detained. The matter of the application was then heard, and, after full argument by counsel representing the State and the said Jenkins, the Judge announced that he would hold the matter under consideration until December 6, 1917, and directed the sheriff to produce the Relator at the Court House in Leonardtown on that day. Briefs of counsel were filed with the judge under leave granted. The sheriff produced the Relator at the time and place directed, and the judge then and there, after filing a careful and well considered opinion, held that the said Lewis C. Jenkins was unlawfully detained in the custody of the sheriff, and ordered that he be forthwith discharged. It is disclosed by the opinion filed, that JUDGE CAMALIER held that section 19 of the Act,—which provided that it should go into effect from the date of its passage— was unconstitutional and void, and that the Act could not in any event take effect until June 1, 1918, and, that since Jenkins was held under a commitment charging him with a violation of the provisions of an Act which was not then in force, he was detained without warrant of law and should be discharged.

It is provided by section 17, Article 42 of the Code:

"Whenever any Court in this State having jurisdiction in the premises, other than the Court of Appeals, or when any judge of any Court in this State having jurisdiction in the premises shall release or discharge any person brought before such court or judge, under the writ of *habeas corpus,* charged with the violation of the provisions of any act of assembly of this State, or section thereof, or of any article or section of the code of public general laws or public local laws of this State, upon the ground, or for the reason, that such act of assembly, or section thereof, or such article or

section of the code of public general laws or public local laws is unconstitutional and void, in whole or in part, because contrary to the constitution or bill of rights of this State, or because contrary to the Constitution of the United States, it shall be the duty of the said court or judge ordering such release or discharge for said cause to reduce his opinion to writing within five days after ordering said release or discharge, and to transmit the original papers in said case, together with a copy of its or his order of release or discharge, and of his said opinion under his hand and seal, to the Clerk of the Court of Appeals; and it shall be the duty of said Court to consider the papers so transmitted to its said clerk, including said order of release or discharge, and said opinion, at the earliest practicable period, after the receipt thereof by its said clerk, and to give its opinion in writing upon the case so presented; and the said opinion so given shall have and possess the same authority as if the same was filed in a case formally heard and determined in said court on appeal."

The question of the constitutionality *vel non* of the section of the Act mentioned is properly before us. *State* v. *Glenn,* 54 Md. 572.

The Act is entitled "An Act to prohibit the manufacture, sale, giving away or otherwise disposing of, transportation, solicitation of orders for intoxicating liquors for beverage purposes within the limits of Prince George's County; for the enforcement of such prohibition; and repealing all laws inconsistent herewith"; and it contains the following recital:

"Whereas, Experience has shown that prohibition is the best policy for the territory in and around forts, arsenals, navy yards, munition plants and seat of National Government during war, and, owing to the close proximity of the District of Columbia, the seat of our National Government, as well as the location of many forts which will be greatly injured by the continued sale of liquor in Prince George's County when

all other territory adjacent and contiguous to the District of Columbia and close to forts and training camps will be under prohibition on and after November 1, 1917, therefore, this bill is introduced and passed as an emergency war measure."

The Act was approved June 28th, 1917.

It is unnecessary to the consideration of the questions before us to examine the several sections of the Act, which is a stringent one, and contains provisions and means well adapted to accomplish the object declared in its title. Section 17 declares:

"That this entire Act shall be deemed an exercise of the police powers of the State for the protection of public health, peace, morals and safety, and all its provisions shall be liberally construed for the attainment of that purpose."

The reasons which led the learned Judge to hold the section of the Act mentioned unconstitutional were: *First*, that the Act was passed under the provisions of Article XVI of the Constitution, and since it did not "contain a section declaring such law an emergency law and necessary for the immediate preservation of the public health and safety, and passed upon a yea and nay vote supported by three-fifths of all the members elected to each of the two houses of the General Assembly," section 19, which declared that the law should go into effect from the date of its passage, was a plain violation of that provision of the Constitution, and was, therefore, void; and *secondly,* that the effect of the law was to abolish the Board of Liquor License Commissioners for Prince George's County, or to change the duties of said officers, and, therefore, the attempt to make the Act go into effect from the date of its passage was nugatory and void, because that was forbidden by that provision of Article XVI of the Constitution which provides that "no measure creating or abolishing any office, or changing the salary, term or duty of any officer, or granting any franchise or special privilege,

or creating any vested right, or interest, shall be enacted as an emergency law."

It is provided by section 31, Article 3 of the Constitution, that: "No law passed by the General Assembly shall take effect until the first day of June next after the session at which it may be passed, unless it be otherwise expressly declared therein." JUDGE CAMALIER held that section 31, Article 3, was superseded by Article XVI of the Constitution, and therefore, "this class of legislation could not be supported" by the above quoted section.

It may well be admitted that section 31, Article 3 of the Constitution, has been modified in important particulars, but we can not agree to the proposition that it has been repealed, or wholly suspended by Article XVI. It was not expressly repealed by that Article, and it is not declared therein that it was the purpose of the Legislature that the new article be substituted for and in lieu of it. It is not mentioned or referred to in Article XVI, and it would be reasonable to suppose that if the General Assembly had intended to abrogate or wholly suspend it some mention would have been made of that fact. But the Act—Chapter 673 of the Acts of 1914—which submitted the proposed Article to the vote of the legal and qualified voters of the State does not profess to abrogate or repeal any provision of the Constitution. It was declared to be "an Act to amend the Constitution by adding thereto a *new article* to be entitled Article XVI providing for the Referendum," and the first section of the Act provides for the submission to the voters "of the following *new* and *additional* article to be known as Article XVI, title The Referendum."

We are not called upon to point out the particular classes of laws which are still subject to the provisions of section 31 of Article 3. We confine ourselves to the question, which as we conceive it, lies at the basis of the whole controversy in this case. That question is one of constitutional construction, and is this: Was the Act of 1917, Chapter 13, passed under Article XVI and subject to its provisions, or does it belong

to that class of legislation to which the Article does not apply? If it belongs to the latter character of legislation, we think it is subject to the provisions of section 31, Article 3, and is not invalid for the reasons urged against it, for in that case there is no inconsistency between the two provisions of the Constitution under consideration in this case.

The first and second sections of Article XVI, entitled "The Referendum," are as follows:

"Section 1. (*a*) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, if passed by the General Assembly over the veto of the Governor;

"(*b*) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted.

"Section 2. No law enacted by the General Assembly shall take effect until the first day of June next after the session at which it may be passed, unless it contain a section declaring such law an emergency law and necessary for the immediate preservation of the public health or safety, and passed upon a yea and nay vote supported by three-fifths of all the members elected to each of the two Houses of the General Assembly; provided, however, that said period of suspension may be extended as provided in section 3 (*b*) hereof. If before said first day of June there shall have been filed with the Secretary of the State a petition to refer to a vote of the people any law or part of a law capable of referendum, as in this Article provided, the same shall be referred by the Secretary of State to such vote, and shall not become a law or take effect until thirty days after its approval by a majority of the electors voting thereon at the next ensuing election held throughout the State for members of the House of Representatives of the United States. An emergency

law shall remain in force notwithstanding such petition, but shall stand repealed thirty days after having been rejected by a majority of the qualified electors voting thereon; provided, however, that no measure creating or abolishing any office, or changing the salary, term or duty of any officer, or granting any franchise or special privilege, or creating any vested right or interest, shall be enacted as an emergency law. No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to. rejection or repeal under this section. The increase in any such appropriation for maintaining or aiding any public institution shall only take effect as in the case of other laws, and such increase or any part thereof specified in the petition, may be referred to a vote of the people upon petition."

The third, fourth and fifth sections provide the mode and means by which the Referendum may be put into effect. The sixth section provides that:

"No law or constitutional amendment licensing, regulating, *prohibiting,* or submitting to local option the manufacture or sale of malt or spirituous liquors shall be referred, or repealed under any Act under the provisions of this Article."

It is a familiar principle in the construction of a constitution that the construction should be upon the whole instrument, and effect given to every part of it, if that be possible, and that, unless there be some reason to the contrary, no part of the fundamental law should be disregarded. or rejected as inoperative. In seeking for the meaning of a particular provision or Article, it must be examined in the light of its origin, the purpose it was intended to serve, as well as the evils it was intended or supposed to remedy. It has been well said that a very useful key to the construction of a stat-

ute or a constitution is to inquire what were the evils to be removed, and what remedy did the new instrument propose, and that when any question arises requiring a judicial construction of any of its clauses, it is important to go back and ascertain the evil that was intended to be remedied.

When Article XVI is examined in the light of this accepted principle it is not difficult to ascertain its meaning and its limitations. From the establishment of the first Constitution of Maryland—and it might be said before that date —until the adoption of this Article its people had lived under a well recognized form of representative self-government. This principle of *representation* had its beginning in the early legal institutions of England, and was brought to America by the Colonists. It was incorporated in the governmental systems of all the Colonies, and subsequently found its way into the constitutions of the respective States, as well as into the Constitution of the United States. It was for many years looked upon as one of the great principles of popular government, and as necessary and indispensable for the preservation of civil order and popular liberty. After the close of the Civil War great abuses began to creep into legislation and into the administration of the National and State governments. Their greatest expansion and evil influences were more marked, perhaps, between the years 1880 and 1900. They were alleged to have grown out of the control by corrupt methods of legislation and administration by great corporations and a group of individuals in each State who had taken into their hands the machinery of each of the great political parties. In this way and by these methods it was charged that the government, in all its departments, was prostituted to corrupt and selfish purposes. To remedy these evils it was proposed by some to abolish the principle of representation, and to introduce the principle of direct legislation by the people; by others to modify the principle of representation by incorporating into the organic law the Referendum, together with certain other plans with which we are not here concerned. These proposals promised much,

and found favor with a number of States which have adopted them in their organic law.

The Referendum, broadly speaking, is the reservation by the people of a State, or local subdivision thereof, of the right to have submitted for their approval or rejection, under certain prescribed conditions, any law or part of a law passed by the law making body. It was designed as a modification of, or as a supplement to the principle of representation with which we had long been familiar, and it was claimed for it that it would prevent the reoccurrence of many of the abuses to which we have referred. This is the new instrument of government, which in a modified form, is engrafted on the Constitution of this State by Article XVI. We say in a *modified* form, because the broad and general terms of the first section of the Article are restrained and limited by subsequent provisions. There are exceptions, notably those embraced in the sixth section, which indicate clearly that it was not intended that the provisions of the Article should apply to all legislation.

It is an acknowledged rule in the construction of a Constitution that exceptions from its power are limitations upon the power, and it would be useless to declare certain exceptions to the general and unrestricted terms of the first section, if the excepted cases are not to be recognized as removed from the operation of the provisions of the Article. It appears to us to be manifest that none of the provisions of Article XVI was intended to apply to the class of legislation dealt with in the Act of 1917, Chapter 13. This legislation is expressly taken out of its provisions, and the general language employed in sections 1 and 2 must be limited and understood to apply only to such legislation as may be capable of referendum under the Article. The section of the Article which declared that it should go into effect from the date of its passage was fully authorized by section 31, Article 3, which, as to this class of legislation, remains in full force and effect.

The other objection, stated in the early part of this opinion, to the validity of the Act is based upon the assumption that it was passed under Article XVI. Inasmuch as we have held that the Act was not passed under that Article, this objection must fail, as it is not claimed, and we do not find, that it violates any other provision of the Constitution.

We have not thought it necessary to support this opinion by quoting from adjudicated cases in this and other States statements of the principles by which the courts must be controlled in the decisions of questions like the one before us. Those principles are well understood, and have been announced and applied in many cases in this Court, among the more recent of which are *Bonsal* v. *Yellott,* 100 Md. 481; *McCurdy* v. *Jessop,* 126 Md. 318; *Painter* v. *Maltfeldt,* 119 Md. 466. In *Crouse* v. *State,* 130 Md. 364, this Court adopted the following principle of construction announced in *People* v. *McBride,* 234 Ill. 146: "The rule of law is, that an investigation like this, concerning the constitutionality of an act of the Legislature, begins with the presumption that the act is valid. All doubts or uncertainties arising either from the language of the Constitution or the act must be resolved in favor of the validity of the act, and the Court will only assume to declare it void in case of a clear conflict with the Constitution. The duty of the Court is to so construe acts of the Legislature as to uphold their constitutionality and validity if it can reasonably be done, and if their construction is doubtful the doubt will be resolved in favor of the law." In *Cooley on Constitutional Limitations* (3rd Ed., p. *57), the rule to be applied is thus stated: "Every such instrument is adopted as a whole, and a clause which standing by itself, might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law. It is therefore a rule of construction, that the whole is to be examined with a view to arriving at the true intention of each part; and this Sir Edward Coke regards the most natural and genuine method of expounding a statute. 'If any section (of law) be intricate, obscure, or

doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another.' And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is, that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.

This rule is especially applicable to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a Court would be justifiable in declaring any portion of a written constitution nugatory because of ambiguity. One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."

It follows from the construction we have placed upon Article XVI—a construction based upon the rules announced in the authorities cited—that JUDGE CAMALIER was in error in holding that the Relator, Lewis C. Jenkins, was unlawfully detained in the custody of the Sheriff of Prince George's County under the commitment referred to, and in ordering his discharge, and, therefore, the order of discharge must be reversed, and it is so ordered.

*Order reversed.*