53 A.3d 1111

John DOE, et al.

v.

MARYLAND STATE BOARD OF ELECTIONS, et al.

No. 131, Sept. Term, 2011.

Court of Appeals of Maryland.

Sept. 25, 2012.

Joseph E. Sandler (Elizabeth F. Getman of Sandler, Reiff, Young & Lamb, P.C., Washington, D.C.), on brief, for Appellants.

Brett Marston (Michael Harris and Laura Cofer Taylor of Arnold & Porter, LLP, Washington, D.C.), on brief, for Appellants.

Matthew J. Fader, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Jeffrey L. Darsie, Asst. Atty. Gen., Baltimore, MD), for Appellees.

Paul J. Orfanedes (Chris Fedeli of Judicial Watch, Inc., Washington, D.C.), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and LAWRENCE F. RODOWSKY, (Retired, specially assigned), JJ.

GREENE, J.

The Act at issue in the present case is Senate Bill 167, Chapter 191 of the 2011 Laws of Maryland (the "Maryland

Dream Act" or "the Act"). The Act seeks to exempt certain students from paying out-of-state tuition rates at higher education institutions in Maryland. The Act was signed into law on May 10, 2011. Following the enactment, MDPetitions.com ("Appellee–Intervenor") petitioned to refer the Maryland Dream Act to Maryland's 2012 General Election ballot. Pursuant to Article XVI of the Maryland Constitution, Maryland residents may "approve or reject at the polls, any Act, or part of any Act of the General Assembly," by petitioning to place the enacted Bill on the general election ballot. Md. Const. art. XVI, § 1(a). The Maryland State Board of Elections ("Appellee," or "Board") is the agency empowered to certify petitions for referendum under Article XVI of the Maryland Constitution. The Board certified the petition for referendum.

In response to the Board's certification, John Doe, *et al.*, ("Appellants"), representing a group of individuals supporting the Maryland Dream Act, challenged its referability. Appellants filed a Complaint, and later an Amended Complaint, in the Circuit Court for Anne Arundel County, seeking to remove the Act from consideration on the November 2012 ballot. Appellants maintained that the Act is an "appropriation for maintaining the State Government" within the meaning of Section 2 of Article XVI, of the Maryland Constitution and is, therefore, not subject to referendum. The Board filed, in the Circuit Court proceedings, its response, followed by the response of the Appellee–Intervenor, MDPetitions.com. After consideration of the various motions filed for summary judgment, the trial judge, the Honorable Ronald A. Silkworth, entered summary judgment in favor of Appellees and against Appellants. The court reasoned that the Maryland Dream Act, standing alone, failed to meet the standards adopted by this Court for determining that the law makes an appropriation for the maintenance of State Government. Therefore, according to Judge Silkworth, the Act is a proper subject for referendum. Similarly, the court rejected Appellants' arguments that the Act should be read *in pari materia* with the Cade Funding Formula, Md.Code (1978, 2008 Repl.Vol.), § 16–305 of the Education Article, and future budget bills to

find that the Act is an appropriation and thereby exempted from referendum.

Following the judgment of the Circuit Court, Appellants noted an appeal to the Court of Special Appeals. Prior to any proceedings in that court, we granted Appellants' petition for writ of *certiorari* to address the following question:

> Is the Maryland Dream Act, which directly mandates and requires an increase in future appropriations for community colleges and which regulates the amount of tuition revenue received by the University System of Maryland, a law "making any appropriation for maintaining the State Government" within the meaning of Article XVI, section 2 of the Maryland Constitution and thereby exempt from referendum?

After oral argument on June 12, 2012, this Court issued its per curiam Order as follows:

> For reasons to be stated in an opinion later to be filed, it is this 13th day of June, 2012,
>
> ORDERED, by the Court of Appeals of Maryland, that the judgment of the Circuit Court for Anne Arundel County be, and it is hereby, affirmed. Costs to be paid by the Appellants. Mandate to issue forthwith.

We now set forth our reasons for that Order.

## FACTUAL AND PROCEDURAL BACKGROUND

Article XVI of the Constitution of Maryland defines the referendum power reserved to the people of the State:

**Section 1. Reservation of power of referendum in people; article self-executing; additional legislation**

(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved

by the Governor, or, if passed by the General Assembly over the veto of the Governor.

Md. Const. art. XVI, § 1(a).[1]

The referendum right is not applicable to all legislation enacted by the General Assembly, however. Section 2 of Article XVI limits the right of referendum, in pertinent part, as follows:

> No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section.

Md. Const. art. XVI, § 2.[2]

Senate Bill 167, commonly known as the Maryland Dream Act, was enacted by the Maryland General Assembly during its 2011 session and signed into law by the Governor on May 10, 2011. The Act establishes new categories of individuals who may be eligible for in-state tuition rates at community colleges and public four-year colleges and universities in Maryland. Military veterans are the first category of individuals. Specifically, § 15–106.4 of the Education Article, as amended by the Maryland Dream Act, prolongs from one year to four years the duration after completion of military service in

---

**1.** The petition for a statewide referendum "shall be sufficient if signed by three percent of the qualified voters of the State of Maryland, calculated upon the whole number of votes cast for Governor at the last preceding Gubernatorial election...." Md. Const. art. XVI, § 3(a). The Board is charged with overseeing the petition process. This responsibility includes ensuring that the petition has the applicable number of signatures and otherwise satisfies the requirements of the Referendum Amendment and Title 6 of the Election Law Article. Once the Board certifies the petition, it shall place the ballot question on the next statewide general election ballot. Md.Code (2002, 2010 Repl.Vol.), §§ 6–207, 6–208 of the Election Law Article.

**2.** Another limitation to the Referendum Amendment appears in § 6, and states that "No law, licensing, regulating, prohibiting, or submitting to local option, the manufacture or sale of malt or spirituous liquors, shall be referred or repealed under the provisions of this Article." Md. Const. art. XVI, § 6.

which certain honorably-discharged veterans of the United States armed forces can qualify for in-state tuition benefits.[3] The Act also adds § 15–106.8, which allows "undocumented immigrant individual[s]" who meet certain conditions to be eligible for the in-state tuition rate at community colleges in Maryland. A candidate for in-state tuition eligibility must prove that he or she attended a Maryland secondary school for at least three years. Additionally, he or she must provide documentation of Maryland income tax returns for the three years during attendance at secondary schools and the period before and during attendance at community colleges. Finally, the individual must show that he or she graduated from a Maryland secondary school or received an equivalent diploma in Maryland. The Act also includes similar eligibility criteria to qualify for in-state tuition at a four-year public institution in Maryland upon graduation or receipt of 60 credits from a Maryland community college. Md.Code (1978, Supp.2011), § 15–106.8(a)–(c) of the Education Article.

The Department of Legislative Services prepared a Fiscal and Policy Note concerning the Maryland Dream Act for the Members of the General Assembly. Md.Code (1984, 2009 Repl.Vol.), § 2–1505 of the State Government Article. The Summary provided for the Act stated that under the State's funding formula for determining State aid to community colleges, State expenditures would rise as a result of an increase in the enrollment of qualified in-state students at community colleges. It further stated that "[t]uition revenues at public institutions of higher education may be affected, with a potential significant loss of revenues for specific institutions beginning in FY 2013. **This bill affects a mandated appropriation.**" (emphasis in original). Dep't of Legislative Servs., Revised Fiscal and Policy Note, S.B. 167 at 1 (2011). The

---

3. An individual in this category may qualify by showing that he or she is stationed in, resides in, or is domiciled in Maryland. The individual must prove that he or she attended a Maryland secondary school for at least three years, and that he or she graduated from a Maryland secondary school or received a high school equivalency diploma. Md. Code (1978, Supp.2011), § 15–106.4(b) of the Education Article.

Department of Legislative Services later explained, however, that "[t]here is little information available on the number of additional students who might qualify for resident tuition, thus the general fund expenditure increase cannot be reliably estimated." Dep't of Legislative Servs., Revised Fiscal and Policy Note, S.B. 167 at 8 (2011).

The Cade Funding Formula calculates the minimum amount of funding for community colleges in the State that the Governor must incorporate in the annual Budget Bill submitted to the General Assembly. § 16–305 of the Education Article. The formula was enacted by the General Assembly in 1996 to provide consistency in the amount of funding the State would provide its public colleges and universities. The formula works by first calculating "the State's General Fund appropriation per full-time equivalent student" at four-year public institutions in Maryland. § 16–305(c)(1) of the Education Article. Next, the formula takes into consideration the number of full-time equivalent students in community colleges receiving in-state tuition. § 16–305(c) of the Education Article. This number is based on "the fiscal year 2 years prior to the fiscal year for which the State share is calculated ...." § 16–305(b)(7) of the Education Article. The formula requires that a percentage—set by the Maryland General Assembly—of the allocation afforded to four-year public institutions in Maryland be matched and provided to the State's community colleges. The statute further mandates that the Governor include the amount of funding in the Budget Bill that he or she presents to the General Assembly each year. The Legislature, however, is free to amend that amount and adjust the percentage allocated to community colleges at its discretion, but the Legislature may not increase it.

The Budget Amendment to the Maryland Constitution was ratified in 1916 and provides an extensive executive budget system for the State. Md. Const. art. III, § 52. The Budget Amendment requires that "[e]very appropriation bill shall be either a Budget Bill, or a Supplementary Appropriation Bill." Md. Const. art. III, § 52(2). The Governor is required to prepare the annual Budget Bill, and it must be balanced or

show a surplus, so that the total appropriation number does not exceed the total estimated revenue number. Md. Const. art. III, § 52(5a). Once the Governor presents the Budget Bill to the General Assembly, the General Assembly may strike out or reduce items in the Bill, subject to certain exceptions. The General Assembly may not increase or add appropriations. Md. Const. art. III, § 52(6). If the General Assembly passes the Budget Bill, it becomes law. The General Assembly may make additional appropriations through a Supplementary Appropriation Bill, which must be approved by the Governor. These bills "shall provide the revenue necessary to pay the appropriation thereby made . . . ." Md. Const. art. III, § 52(8).

After enactment of the Maryland Dream Act, Appellee–Intervenor, MDPetitions.com, collected the requisite number of signatures in support of a petition to put the Act to referendum in the November 2012 General Election. The Board certified the petition for ballot pursuant to Article XVI of the Maryland Constitution.

Appellants, which include two unnamed undocumented immigrants who allegedly would qualify for in-state tuition under the Act, six registered voters in support of the Act, and CASA de Maryland, commenced an action against the Secretary of State and the Board, challenging the certification of the petition and seeking Declaratory and Injunctive relief. Appellants then filed an Amended Complaint, alleging that the Maryland Dream Act is not a law subject to referendum under Article XVI of the Maryland Constitution. After the Board filed an Answer to the Amended Complaint, MDPetitions.com moved to intervene and was granted permission to participate as a defendant. Intervenor filed its Answer to Appellants' Amended Complaint. Thereafter, the parties voluntarily stipulated to the dismissal, with prejudice, of the parts of the Amended Complaint that challenged the adequacy of the signatures presented in the petition for referendum. Additionally, the parties stipulated to the dismissal of the Declaratory Judgment and Injunction counts, to the extent they

pertained to the sufficiency of the number of signatures included in the referendum petition.

Appellants next filed a Motion for Summary Judgment. The Board filed an Opposition to Appellants' Motion, and included a Cross–Motion for Summary Judgment. On that same day, Appellee–Intervenor filed a Cross–Motion to Dismiss or a Motion for Summary Judgment. Appellants submitted a Reply and Response in Opposition to the Board's and Appellee–Intervenor's Cross–Motions for Summary Judgment. Subsequently, the Board and Appellee–Intervenor filed their corresponding replies.

On February 17, 2012, Judge Silkworth denied Appellants' Motion, granted the Board's Motion, and granted Appellee–Intervenor's Motion as it applied to the referability of the Maryland Dream Act. Appellee–Intervenor had also challenged Appellants' standing to contest the referendum. That Motion was denied, with the court deciding that Appellants had met the standing requirements in Section 6–209 of the Election Law Article of the Maryland Code. With regard to the Maryland Dream Act, the court concluded that the Act did not fall under the appropriation exception in the Maryland Constitution, and could thus be subject to referendum. The court ordered the measure added to the November 2012 General Election ballot.

## Standard of Review

In this appeal, we review a trial court's grant of summary judgment. This Court reviews the grant of summary judgment pursuant to Maryland Rule 2–501. "A trial court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Piscatelli v. Van Smith,* 424 Md. 294, 305, 35 A.3d 1140, 1146 (2012) (citation omitted). Our determination of whether the trial court's grant of summary judgment is proper "is a question of law, subject to a non-deferential review on appeal." *Tyler v. City of College Park,* 415 Md. 475, 498, 3 A.3d 421, 434 (2010) (citation omitted). This analysis "begins with the determination [of]

whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law." *Appiah v. Hall,* 416 Md. 533, 546, 7 A.3d 536, 544 (2010) (citing *O'Connor v. Balt. Cnty.,* 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004)). "We review the record in the light most favorable to the non-moving party and [we] construe any reasonable inferences that may be drawn from the well-pled facts against the moving party." *Muskin v. State Dep't of Assessments & Taxation,* 422 Md. 544, 554–55, 30 A.3d 962, 968 (2011) (citation omitted). A material fact is a fact, "the resolution of which will somehow affect the outcome of the case." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985) (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974)). If there is no material fact in dispute, we determine whether the trial court correctly granted summary judgment as a matter of law. *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.,* 404 Md. 560, 571, 948 A.2d 11, 18 (2008).

Based upon the factual stipulations presented to the trial judge by the parties, we conclude that there were no material facts in dispute. Therefore, we examine whether the trial judge correctly granted summary judgment in favor of the Appellee as a matter of law.

## DISCUSSION

The issues before us in this case are (1) whether the Maryland Dream Act is a law making an "appropriation" within the meaning of the Referendum Amendment; and (2) if it is such a law, whether the "appropriation" made by the Act is for "maintaining the State Government," thus falling under the appropriations exception to the referendum amendment in Article XVI and making the Act exempt from referendum.[4]

---

4. As a preliminary matter, Appellee–Intervenor argues that Appellants lack sufficient standing under Section 6–209 of the Election Law Article of the Maryland Code to challenge the referability of the Maryland Dream Act. Appellee–Intervenor claims that Appellants John Doe and CASA de Maryland lack standing under Section 6–209(a), which per-

We have concluded that the Maryland Dream Act is not an appropriation for the purposes of maintaining the State Government. This conclusion is reached based on our determination that the primary object of the bill is not to appropriate money by assigning public monies to a particular use. Furthermore, we determine that the Act is not an appropriation *in pari materia* with the Cade Funding Formula and future budget bills. Rather, the Act is a general law defining eligibility requirements for classes of individuals.

## I. Appropriation of Funds

The first question before us is whether the Maryland Dream Act appropriates funds so as to meet the first part of the appropriation exception to the Referendum Amendment. The Referendum Amendment to the Maryland Constitution was first proposed by the General Assembly in Chapter 673 of the Acts of 1914. The Amendment was ratified in 1915 and added to the Constitution during the wave of Populist and Progressive Movements sweeping the country at the time. *See Kelly v. Marylanders for Sports Sanity*, 310 Md. 437, 450, 530 A.2d 245, 251 (1987) (citation omitted). Section 1 defines the power

---

mits challenges of Board decisions by "a person aggrieved by" such a determination. Md.Code (2002, 2010 Repl.Vol.), § 6–209(a) of the Election Law Article. Appellee–Intervenor further claims that Appellants lack standing under Section 6–209(b), which permits registered voters to challenge a petition's certification. Md.Code (2002, 2010 Repl.Vol.), § 6–209(b) of the Election Law Article. These arguments were raised earlier before the Circuit Court, and Judge Silkworth provided a thorough analysis of the claims. The court determined that Appellant John Doe had standing under 6–209(a), because he would otherwise be eligible for in-state tuition under the Maryland Dream Act, and the repeal of the Act would effectively prevent him from attending a State community college. The court also determined that the Appellants, who are registered voters, had standing under 6–209(b), given its broad language permitting "any registered voter" to seek judicial review "as to any petition." The court determined it need not reach the merits of Appellee–Intervenor's claim as it applied to CASA de Maryland because it had already found eligible plaintiffs to seek relief under both provisions for judicial review in Section 6–209. Because we find no error in the judge's reasoning or determination, we affirm this aspect of the court's opinion and proceed to the merits of Appellants' constitutional claims.

of the referendum and has been described as "the heart of the amendment." *Bayne v. Sec'y of State*, 283 Md. 560, 565, 392 A.2d 67, 70 (1978).

**Section 1. Reservation of power of referendum in people; article self-executing; additional legislation.**

(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor.

Md. Const. art. XVI, § 1(a).

The right of referendum is subject to several exceptions, however. These limitations are defined in § 2, and § 6 of the Amendment, respectively. The exception at issue in this case is found in Section 2, and states:

No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section.

Md. Const. art. XVI, § 2.

Since its addition, this Court has said that the Referendum Amendment's meaning and limitations should be determined "in the light of its origin, the purpose it was intended to serve, as well as the evils it was intended or supposed to remedy." *Kelly*, 310 Md. at 451, 530 A.2d at 251 (citing *Beall v. State*, 131 Md. 669, 676, 103 A. 99, 102 (1917)). We have traced the history and purpose of the Referendum Amendment in a number of cases. We have discussed, for example, why the referendum provision was added as a supplement to the principle of representative government. *See Ritchmount P'ship v. Board*, 283 Md. 48, 60–61 n. 9, 388 A.2d 523, 531 n. 9 (1978) (noting that the people's power to use the referendum was enacted "[i]n response to the public outcry over corruption in state government and alleged abuses of legislative power...."); *Beall v. State*, 131 Md. 669, 676–78, 103 A. 99,

102 (1917) (explaining that the Referendum Amendment was designed in the wake of the "great abuses ... grown out of the control by corrupt methods of legislation and administration by great corporations and a group of individuals in each [s]tate," such that "the government, in all its departments, was prostituted to corrupt and selfish purposes ... as a modification of, or as a supplement to the principle of representation ... [to] prevent the reoccurrence of many of [these] abuses...").

We have also discussed the origins and purpose of the appropriation exception to the Referendum Amendment. *See Bickel v. Nice*, 173 Md. 1, 10, 192 A. 777, 781 (1937) ("It is undoubtedly true that the actuating purpose of the excepting clause was to prevent interruptions of government."); *Kelly*, 310 Md. at 456, 530 A.2d at 254 (quoting 12 *Op. Md. Att'y Gen.* 228, 235–36 (1927)) ("[T]he framers of Art. XVI 'had in mind that if laws making appropriations for maintaining the State government were subject to referendum, it would be possible, through the exercise of this power by the people, to cause the State serious financial embarrassment in the performance of its various essential functions.' ").

Over time we have reviewed the Amendment's history to interpret when a law is, in fact, considered an "appropriation" within the meaning of the exception clause. The Maryland Constitution provides that, "[e]very appropriation bill shall be either a Budget Bill, or a Supplementary Appropriation Bill, as hereinafter provided." Md. Const. art. III, § 52(2). This Court has expanded the scope of this exception to cover, in addition to Budget Bills and Supplementary Appropriation Bills, "that class of money bills or spending measures contemplated by the exceptions to the referendum right under Art. XVI." *Kelly*, 310 Md. at 455–56, 530 A.2d at 254 (citing 12 *Op. Md. Att'y Gen.* 228 (1927)) (noting that the term "appropriation" has a more expansive meaning in Article XVI than it does in the Budget Amendment).

As the trial judge noted, and the parties do not contend otherwise, the Maryland Dream Act is neither a Budget Bill

nor a Supplementary Appropriation Bill. Furthermore, Appellants conceded before the Circuit Court and this Court that the Maryland Dream Act is not a revenue-raising measure, and thus not a "money bill."[5]  Therefore, we need not and do not address these matters as they are not at issue before this Court.  To be excepted from referendum under the appropriations exception in Article XVI of the Maryland Constitution, the Maryland Dream Act would need to constitute a spending measure appropriation.

A spending measure appropriation is any "law[ ] assigning public monies to a particular use or purpose, regardless of whether such law is adequate or legally sufficient to authorize the payment or disbursement of the appropriated monies." *Kelly*, 310 Md. at 456, 530 A.2d at 254 (quoting 12 *Op. Md. Att'y Gen.* 228, 235 (1927)).  In *Dorsey v. Petrott*, this Court went further to explain that the appropriation must be "made by a constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum of money for a specified public object or purpose to which such sum is to be applied." *Dorsey*

---

5.  Appellants argue that although the Maryland Dream Act is not a revenue-raising measure, it is still within the scope of the appropriation exception as a money bill because it is revenue-*related*.  Appellants claim that by changing the eligibility requirements for in-state tuition, the Maryland Dream Act decreases the amount of tuition received by the University System of Maryland, and therefore the State, in future years.  This reduction in revenue will require additional spending and adjustments in future budget bills.  As the Board notes, however, the appropriation exception includes acts with revenue-raising measures because an inability to raise revenue could "cause the State serious financial embarrassment in the performance of its various essential functions." *Kelly*, 310 Md. at 456, 530 A.2d at 254 (quoting 12 *Op. Md. Att'y Gen.* 228, 236 (1927)).  It does not follow, then, that the State will not be able to satisfy its financial obligations if it is prevented from losing revenue as a result of referring the Maryland Dream Act to the ballot.  In other words, there is a distinctive difference between referring a bill that, in itself, would stop the State from meeting its financial obligations, and a bill that changes the State's obligations such that at some point in the future, financial adjustments may be needed.  Many bills passed by the General Assembly may require future revenue-related adjustments.  This need in itself does not make the bill a money bill for the purposes of the appropriation exception.

*v. Petrott,* 178 Md. 230, 245, 13 A.2d 630, 637–38 (1940). "[A]n Act of the General Assembly which relates primarily and specifically to a subject matter of general legislation cannot be converted into an appropriation bill merely because there may be an incidental provision for an appropriation of public funds." 178 Md. at 251, 13 A.2d at 640. Therefore, to meet the appropriation exception in Article XVI, § 2, a law that includes merely assigning public monies to some incidental purpose is not enough; rather that law's primary purpose must be to assign the monies for a specified purpose. *See Kelly,* 310 Md. at 459, 530 A.2d at 256 (citing *Dorsey,* 178 Md. at 251, 13 A.2d at 640).

For the purposes of this analysis, therefore, our focus is on whether the Maryland Dream Act's primary object is to appropriate funds or assign public monies to a specified purpose. Next, we analyze whether the Act appropriates funds or assigns monies on its own, or *in pari materia* with the statutory Cade Funding Formula and future budget bills. If the answer to either of these questions is no, then the Act is not an appropriation for the purposes of the referendum exception in Article XVI of the Maryland Constitution.

## A. Maryland Dream Act's Primary Purpose

Consistent with Maryland's Constitutional framework, to be an appropriation for the purposes of the referendum exception in Article XVI, the Maryland Dream Act's primary object must be to assign public money for a specified public purpose. "[A]lthough an act of the General Assembly may be passed for the purpose of maintaining the State government, the act is nevertheless subject to the Referendum, unless it be an act so appropriating public funds for that purpose." *Dorsey v. Petrott,* 178 Md. at 245, 13 A.2d at 638. *Dorsey* concerned the referability of a statute dealing with the conservation of fisheries in Tidewater Maryland, and the creation of a Commission of Fisheries. The statute defined how the Commissioners and their employees were to be chosen, their qualifications, powers, duties, salaries, and additional provisions relating to inspection fines. We determined

that the statute in question was "a general law," and "not an appropriation" measure, as its main purpose was for effecting a change in policy of the State through "creat[ing] and abolish[ing] offices, and [by] chang[ing] the terms, duties and salaries of public officers." 178 Md. at 249, 13 A.2d at 640. We warned against turning a "subject matter of general legislation . . . into an appropriation bill merely because there may be an incidental provision for an appropriation of public funds." 178 Md. at 251, 13 A.2d at 640. By contrast, in *Kelly*, we concluded that the law at issue "contain[ed] an intricate financing mechanism" that allowed the State to receive and expend public monies. 310 Md. at 460, 530 A.2d at 256. The bill was specifically designed to instruct how the Maryland Stadium Authority was to borrow and expend the funds necessary to fulfill the primary objective of obtaining a stadium site and constructing sports facilities. We thus held that the law at issue in *Kelly* was intended to be included within the appropriation exception.

Appellants point to the Fiscal Note prepared by the Department of Legislative Services, arguing that the Maryland Dream Act "affects" the State's appropriation of funds to public institutions of higher education. By changing the eligibility for in-state tuition, Appellants argue, the General Assembly is inherently affecting the financing of higher education in the State. According to Appellants, this Court would be reading the appropriation exception too narrowly if we determined that the Maryland Dream Act's primary purpose was not to change the amount of State funding for community colleges. By contrast, the Board argues that if this Court interprets the appropriation exception as the Appellants request, then every legislation which has some future potential impact on an appropriation would fit under this exception, even when the purpose is clearly not primarily to appropriate funds. According to the Board, for the purposes of this exception, an Act "affecting" an appropriation is not the same as an Act whose primary purpose is to make an appropriation.

■ The primary purpose of the Maryland Dream Act is not to appropriate funds from the treasury to support certain classifications of students. Rather, the Act sets eligibility requirements, and any impact this has on state spending is an incidental effect of the changed eligibility requirements. The primary object of the Act is to change the policy for in-state tuition eligibility, which may then affect the amount of money allocated to community colleges in the future. As Judge Silkworth found, the Act does not reference appropriations or revenues. Instead, it defines new eligibility requirements for a certain class of students. The impact on future appropriations is several steps removed from the primary purpose of the bill, and these effects are an incidental result of the changed eligibility requirements. Incidental effects are not enough to meet the appropriation exception. *Dorsey,* 178 Md. at 251, 13 A.2d at 640. To read the appropriation exception a different way would be to expand the exception beyond its intended purpose, effectively depriving voters the right to referendum.

## B. Appropriation of Funds *In Pari Materia* with Other Legislation

■ Because Appellants concede that the Maryland Dream Act alone does not make an appropriation, we examine whether it does so *in pari materia* with an already enacted Cade Funding Formula and associated future budget bills. This analysis requires a determination as to whether the Act may even be considered *in pari materia* with the other legislation, and if so, whether the combination of legislation appropriates funds by assigning public monies to a specified purpose.

This Court in the past has allowed legislation making no appropriation to be construed *in pari materia* with legislation making an appropriation for purposes of meeting the exception in Article XVI. The foremost example of such a case is *Kelly,* where opponents of a plan to construct sports stadiums in Baltimore City sought to put to referendum the two statutes commissioning that project. 310 Md. at 446–47, 530 A.2d at 249. The first bill, Chapter 124 of the 1987 Laws of

Maryland, dealt with the project's financing. Specifically, Chapter 124 commissioned the Maryland Stadium Authority to obtain funds by issuing bonds, the proceeds of which would be disbursed through the Maryland Stadium Authority's Financing Fund. The Authority could use those funds for site acquisition and stadium construction. Additionally, the statute required the State to pay the Maryland Stadium Authority's debt through appropriations in the annual Budget Bill. The second bill at issue, Chapter 122 of the 1987 Laws of Maryland, commissioned the Maryland Stadium Authority to designate and construct the Camden Yards sports stadium. We determined that Chapter 124, which contained both revenue and spending measures, was an appropriation and not subject to referendum. 310 Md. at 459–61, 530 A.2d at 256–57. Additionally, although Chapter 122 neither raised revenue nor appropriated funds, it was nonetheless non-referable because it could be read *in pari materia* with Chapter 124, a statute with the primary purpose of raising revenue to fund the construction of the sports stadiums in downtown Baltimore designated in Chapter 122. 310 Md. at 469–74, 530 A.2d at 261–63. We determined that "the form, the substance, [and] the legislative history" of the bills indicated that the bills were meant to "function in tandem as a unitary solution to its singular objective"—the selection and designation of the site (ch. 122) and the funding for the project (ch. 124) to reach the end result of constructing the stadiums. 310 Md. at 473, 530 A.2d at 262–63. In other words, the bills concerned the same subject matter, were enacted in the same session, and if considered apart, "would not be workable to achieve the objective of the appropriation." 310 Md. at 474, 530 A.2d at 263. Rather, the bills were "mutually dependent" on each other and were meant to act as a unitary solution to a singular goal.

Appellants argue that just as Chapters 122 and 124 in *Kelly* were construed *in pari materia*, so too must the Maryland Dream Act be construed *in pari materia* with the Cade Funding Formula and future budget bills. Appellants maintain that the connection between the Act, Cade Funding

Formula, and future budget bills is as follows: The Maryland Dream Act expands the eligibility for in-state students, which, in turn, will raise the number of full-time equivalent students at community colleges. This increase will be calculated into the Cade Funding Formula, together with the state's appropriation for full-time equivalent students at four-year public institutions of higher education, and the statutory percentage identified by the General Assembly. This calculation would then require the Governor to put specified additional appropriations in future budget bills to be considered by the General Assembly. Appellants contend that the Legislature intended the three acts to be interdependent when enacting the Maryland Dream Act, as evidenced by the fact that the General Assembly had access to the Act's Fiscal Note, which noted that the Maryland Dream Act "affects a mandated appropriation," referenced the Cade Funding Formula, and included expenditure estimates. The Board points to the fact that whether or not the General Assembly had access to the Fiscal Note is of no moment because, unlike *Kelly,* the Maryland Dream Act, Cade Funding Formula, and future budget bills were each enacted separately, at different times, with different purposes, and are not in any way mutually dependent.

■ Like the trial court, we see no authority for the proposition that we must consider the Maryland Dream Act together with the Cade Funding Formula and unwritten future budget bills. A general rule of statutory construction is that statutes dealing with the same subject matter, sharing a common purpose, and forming part of a similar system may be construed *in pari materia* to give the full effect to each statute. *See Whack v. State,* 338 Md. 665, 673, 659 A.2d 1347, 1351 (1995) (citation omitted); *Applestein v. Mayor of Baltimore,* 156 Md. 40, 54–55, 143 A. 666, 672 (1928). Characterizing the statutes' object or purpose is one of the more important methods for determining whether they are intimately enough connected to justify interpreting one statute in light of the other statute. *Sutherland Statutory Construction* § 51:3, at 222–31 (7th ed. 2012).

In *Kelly*, we construed a non-appropriating bill with an appropriating bill by focusing on the interdependency of the two acts. We explained that to do such an analysis, "we must determine whether the dominant statutory objective [of chapter 124] can be implemented if [chapter] 122[was] treated as a separate law under [Article] XVI." 310 Md. at 472, 530 A.2d at 262 (quotations omitted). We concluded that Chapter 124 was too dependent on Chapter 122, which served as "the essential building block upon which the remainder of the legislative edifice was predicated to rest." 310 Md. at 473–74, 530 A.2d at 263. Through this dependency analysis, we resolved that the non-appropriating bill had to be construed *in pari materia* with the appropriating bill because the General Assembly intended them to serve as a single solution to a single objective.

Here, however, the Cade Funding Formula and future budget bills are not dependent on the Maryland Dream Act. Should the Act be placed on the ballot, both the Cade Funding Formula and future budget bills would continue to function effectively. Unlike *Kelly*, where the laws were enacted for the same purpose and objective—to construct stadiums in downtown Baltimore—the Maryland Dream Act, Cade Funding Formula, and future budget bills each have different objectives. Appellants argue that the Maryland Dream Act, Cade Funding Formula, and the budget bill all relate to the objective of financing higher education in this State. By this logic, however, any bill relating to higher education in the State would also need to be construed *in pari materia* with those pieces of legislation.[6] Thus, although Appellants attempt to

---

6. Appellants also point to portions of the Senate floor debate where Members of the General Assembly referenced the change to the Cade Funding Formula calculation in the Fiscal Note. Appellants claim that this advances the argument that the Legislators had the Cade Funding Formula and future budget bills in mind when enacting the Maryland Dream Act, and we should therefore construe the statutes together. This in itself, however, is not enough to force the Maryland Dream Act, Cade Funding Formula, and future budget bills to be read *in pari materia*, when their objectives, purposes, and even subject matters are not the same.

draw similarities between this case and *Kelly* to allow the Maryland Dream Act to attach itself to the Cade Funding Formula and future State budget bills, there is no evidence that any of these bills were meant to be construed together like the interdependent bills enacted in *Kelly*.

■■■ We recognize that statutes do not need to have been enacted at the same time, or necessarily refer to each other to be construed *in pari materia*. *See Farmers & Merchants Nat'l Bank v. Schlossberg*, 306 Md. 48, 56, 507 A.2d 172, 176 (1986) ("This principle [of *in pari materia*] applies regardless of whether the statutes were enacted at different times and without reference to one another."). *See also Sutherland Statutory Construction* § 51:3, at 239–40 (7th ed. 2012). Nonetheless, "the rule that statutes *in pari materia* should be construed together has the greatest probative force for statutes relating to the same subject and passed at the same legislative session, especially if they were passed or approved or take effect on the same day, or where a later statute refers to an earlier statute." *Sutherland Statutory Construction* § 51:3, at 242–45 (7th ed. 2012). In *Kelly*, for example, we stated that "[w]e have held time and again that statutes dealing with the same subject matter, particularly when enacted at the same session, being *in pari materia*, must be read together in order to determine their proper construction." 310 Md. at 472, 530 A.2d at 262 (citations omitted). We emphasized that the bills at issue were enacted together to "constitute[ ], in effect, a single, inseparable 'law.' " 310 Md. at 474, 530 A.2d at 263. This stands in sharp contrast to the Maryland Dream Act, Cade Funding Formula, and future budget bills. The Maryland Dream Act, enacted in 2011, was neither enacted with, nor referenced any of the other bills. Rather, the Cade Funding Formula was enacted in 1996 and future budget bills have yet to even be created.

Even if the Maryland Dream Act, Cade Funding Formula, and future budget bills could be construed together, they would also need to make an appropriation. To make an "appropriation" under the appropriation exception, the legisla-

tion must assign public monies to a specified purpose. *Kelly,* 310 Md. at 456, 530 A.2d at 254 (citing 12 *Op. Md. Att'y Gen.* 228, 235 (1927)). In *Kelly,* we pointed out that the revenue and spending bill at issue was an appropriation within the meaning of the appropriation exception. We noted the specific portions of the bill that collect revenue and spend money "to obtain a site and to construct the contemplated sports facilities in the public interest." 310 Md. at 460, 530 A.2d at 256. These included: (1) authorizing the borrowing of funds through bonds; (2) disbursing those funds through the Authority's Financing Fund; and (3) ordering the State to pay off the Maryland Stadium Authority's debt through annual appropriations in the budget bill. This "ambitious revenue producing and spending measure[ ]" designed to raise and spend money for the financing and construction of sports stadiums was found to be an appropriation under the referendum exception. 310 Md. at 467, 530 A.2d at 260. Similarly, in *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723 (1928), this Court considered the referability of a law providing for a gasoline tax, the proceeds of which were to be used to fund State road construction. In that case, the legislation, which articulated exactly how the funds would be collected and disbursed, "fulfill[ed] in itself all the requirements of a supplemental appropriation act...." 155 Md. at 567, 142 A. at 725. Because the Legislature had yet to pass that year's budget bill, however, we construed the legislation *in pari materia* with the Budget Bill to conclude that the legislation was an appropriation.[7] 155 Md. at 567, 142 A. at 725.

Appellants argue that the Maryland Dream Act makes an appropriation because the Act will increase the number of students qualified for in-state tuition at community colleges. In turn, this will increase the number of students qualifying as "full-time equivalent students" under the Cade Funding Formula. Because of this increase to one of the inputs in the

---

7. The General Assembly "shall not finally act upon [a Supplementary Appropriation Bill] until after the Budget Bill has been finally acted upon by both Houses." Md. Const. art. III, § 52(8).

Cade Funding Formula, the Governor will be required to put specified additional appropriations in future budget bills. Appellants support this scheme by adding that the Department of Legislative Services included in their Fiscal Summary for the Act that "[t]his bill affects a mandated appropriation" in correlation with the Cade Funding Formula and future budget bills. Appellants argue that because this statement and a fiscal analysis were before the General Assembly in a Fiscal Note, the Members of the General Assembly intended, that, in enacting the Maryland Dream Act, they were requiring increased spending for aid to community colleges. In contrast, the Board asserts that the Cade Funding Formula only "produces a calculation that becomes the starting point for the General Assembly's consideration of what amount of State funds to appropriate for support of community colleges." The Board claims that there is no certainty that the Act even "affects" a future appropriation, let alone assigns public money to a specified purpose.

Unlike the legislation at issue in *Kelly* and *Winebrenner,* the Maryland Dream Act, even when construed with the Cade Funding Formula and future budget bills, is not an appropriation. The legislation in *Kelly* and *Winebrenner* included extensive references to appropriations and revenues. In fact, the entire scheme in both pieces of legislation was for the purpose of assigning public money for a specified purpose.[8] By contrast, only by tracing a long and complicated path, can we even discover a possible effect on future appropriations through the Maryland Dream Act. The Maryland Dream Act is an enactment of public policy that may increase eligible

---

**8.** Appellants point to the fact that similar to the Cade Funding Formula which the Governor must include in the Budget Bill submitted to the General Assembly, the legislation at issue in both *Winebrenner* and *Kelly* directed the Governor to include additional appropriations in the Budget Bill. While this might be so, it is not that piece of the legislation in *Winebrenner* and *Kelly* that made those bills appropriations. Rather, it was the clear directives contained in the bills relating to revenue raising and government spending that made each bill an appropriation.

student enrollment, which may impact a portion of the Cade Funding Formula, the other portions of which may be altered by the General Assembly.[9] This calculation would then be included in the Governor's budget bill, which is then considered and acted upon by the General Assembly. This legislation is too dependent on unknown variables to be an appropriation assigning public monies for a specified purpose. We conclude that had the General Assembly intended to make the .Maryland Dream Act an appropriation by assigning public monies to a specified purpose as it did in *Winebrenner* and *Kelly*, the Legislature would have done so in a manner more directly resembling an appropriation, instead of enacting the statute to define a policy measure.[10]

---

**9.** As the Board and Appellee–Intervenor note, the General Assembly has frequently altered this ratio by statute in the past. For example, in 2006, the Cade Funding Formula's community college guideline percentage for fiscal year 2013 was 30%. The General Assembly subsequently reduced this number from 27% (in 2009), to 21% (in 2010), to 19% (in 2011). *See* 2011 Md. Laws ch. 397, § 1; 2010 Md. Laws ch. 484, § 3; 2009 Md. Laws ch. 487, § 1; 2006 Md. Laws ch. 333.

**10.** Because we conclude that the Maryland Dream Act is not an appropriation, we do not need to reach the merits of the argument that the appropriation is for the purpose of maintaining State Government. As we have discussed, the Act's primary object is not to make an appropriation. Furthermore, the Act is neither an appropriation in itself, nor is there a basis to read the Act in conjunction with the Cade Funding Formula and future budget bills to find such an appropriation. As such, the Act cannot fall under the purview of the appropriation exception and is therefore eligible for placement on the November general election ballot as a referendum measure.